**FIRST NATIONAL BANK OF LIBERTY, Missouri, Plaintiff,**

v.

**Virginia W. WALLER, Defendant-Respondent,**

**Laura Henson, Executrix of the Estate of James Edgar Williams, Deceased, Defendant-Appellant.**

No. 25120.

Kansas City Court of Appeals.
Missouri.

April 7, 1969.

Motion for Rehearing and/or Transfer to the Supreme Court Denied June 2, 1969.

Arthur R. Kincaid, William B. Waters, Hale, Coleberd, Kincaid & Waters, Liberty, for appellant.

Robert F. Sevier, Liberty, for respondent.

JAMES W. BROADDUS, Special Commissioner.

This is an appeal by Laura Henson, executrix of the estate of James Edgar Williams, deceased, from a judgment in favor of Virginia W. Waller for the sum of $6,980.25.

On July 26, 1967, plaintiff First National Bank of Liberty, Missouri, filed its bill of interpleader in the Probate Court of Clay County, alleging that it was a banking corporation; that Virginia W. Waller was the sister of James Edgar Williams, deceased; that George C. Henson and Laura Henson were the executors of the estate of James Edgar Williams, deceased, pending in said court; that on March 30, 1967, James Edgar Williams was the sole owner of a checking account and that he directed plaintiff to prepare a signature card for himself and sister, Virginia W. Waller, which would authorize the said Virginia W. Waller to write checks upon the account; that the said Virginia W. Waller did, thereafter, write checks on said account until the death of said James Edgar Williams on June 17, 1967, and that at the time of his death, the balance in said account was $6,980.25; that both Virginia W. Waller and said executors, by attorneys, had notified plaintiff that their respective clients claimed the entire amount remaining in said account; that plaintiff was without knowledge of proper ownership and after offering to pay the disputed amount into the registry of the court, requested that the court require said defendants to cross-plead.

Thereafter the executors and Virginia W. Waller filed respective interpleas claiming the fund.

The case was tried in the Probate Court and thereafter an appeal was taken to the Circuit Court. In the latter court counsel for the claimants entered into a stipulation in which it was agreed that the disputed funds were originally in the name of James Edgar Williams only and that the sole issue was whether Virginia W. Waller or Laura Henson, surviving executor, was entitled to the funds. It was further agreed that the court would make the judgment based upon the transcript of the proceedings from the Probate Court, including the testimony and exhibits offered and that all objections made whether sustained or refused would be considered.

The essential facts are: Respondent's first witness was William B. Pence, President of the First National Bank of Liberty. He identified Exhibit I, which bore the signature of James Edgar Williams and Virginia W. Waller. He stated that the Bank kept two cards for its record keeping purposes, but that they were identical. Exhibit I reads as follows:

"The undersigned hereby agree with each other, and with the First National Bank of Liberty, Missouri, that all sums heretofore or hereafter deposited by them, or either of them, with said bank to their credit as joint depositors, *shall be owned by them jointly with right of survivorship,* and be subject to the check or order or receipt of either of them, or the survivor of them * * *. At the death of either of the undersigned, *the survivor shall take absolute and single ownership of the balance then due the account.* Each of us authorize the other to endorse, cash or deposit to the credit of said account, any check or other instrument for the payment of money which may be drawn or endorsed to our joint order or to the order of either of us individually. * * * This agreement *shall not be changed* or terminated except by written *notice to said bank signed by both of the undersigned.* * * *." (Emphasis ours)

Typed at the top of the exhibit are the words "J. E. Williams and Virginia W. Waller auth to sign," and "Individual checking account" across its face, and "In-

dividual checking account" across one end, and "Auth to sign" underneath the signature of Virginia W. Waller. Mr. Pence testified that those typewritten words were placed on the exhibit by the bank without written authority from either James E. Williams or Virginia W. Waller.

On cross-examination the witness was asked regarding a telephone conversation with deceased. Counsel for defendant Waller objected to the question on the ground it was an attempt to vary the terms of a written instrument and that it was in violation of the dead man's statute. The objection was taken with the case. Mr. Pence stated that he had known Mr. Williams for many years, recognized his voice and that he was called by him prior to the March 30, 1967, date and told that he wanted Mrs. Waller to have authority to sign on his account and that he would send her to the bank for a signature card. Mr. Pence stated that he probably told deceased that Mrs. Waters, an employee of the bank, handled signature cards. He testified that several days thereafter the cards came in the mail; that he examined them and that both deceased and Mrs. Waller had signed; that he immediately recognized that the cards were for a joint account, and he took them to Mrs. Waters and told her that she should call Mr. Williams to be certain if he wanted to change the relationship on the account. Mrs. Waters thereafter reported to him that Mr. Williams wanted an authorized signature, and he instructed her as to the typing which should be added.

The executors offered the testimony of Joyce Waters, an employee of the First National Bank for five years and whose duties were opening new accounts, as well as changing accounts. She stated that respondent Mrs. Waller, came to her desk several days before March 30, 1967, identified herself as the sister of Edgar Williams and stated that her brother had called Mr. Pence and talked to him about putting her name on the account and that she wanted signature cards. Mrs. Waters said she had not heard of the matter previously and that she gave her two yellow cards; that she next heard about the matter on March 30, when Mr. Pence brought her the cards with the signatures on them. Mr. Pence told her that he did not understand Mr. Williams to say that he wanted a joint account and he requested her to call him and find out if it was to be a joint or authorized to sign; that she called Mr. Williams' residence and a lady answered. She told her that the bank had received the cards and she wanted to find out if it was to be a joint account or authorized to sign and she was informed that she would have to talk to her brother about it. Thereafter a man's voice came on the phone. There was objection to testimony regarding this conversation on the ground it was an attempt to vary the terms of a written instrument, which objection was taken with the case. Mrs. Waters said that when she asked the man if it was to be a joint account or authorized to sign he immediately said authorized to sign and that there was no further conversation.

Respondent offered the testimony of one Harold Wymore by deposition. The witness testified that he was 68 years of age and had known James Edgar Williams all of his life; that he had gone to school with respondent, frequently visited in the home while she was there, and that he saw her cooking and cleaning; that on his frequent visits he talked with deceased regarding the sale of his farm and his cattle feeding operation; that on one occasion deceased told him that he had gotten a couple of right of survivorship cards from the First National Bank; that if there was anything left when he was gone he wanted his sister to have it. The witness said that sometime after that deceased told him that the bank had gotten fouled up about the survivorship cards and that the girl had called and told him that she had changed the card to read "right to sign". The witness said that deceased hit the ceiling and told her she didn't have the right to change the card and he told the witness he was

going to have to go and get it straightened out as soon as he felt like going downtown. On cross-examination the witness stated that he was told by deceased that he wanted someone to write checks on his account in the event he was physically unable to do so and he reiterated the deceased also said he wanted his sister to have whatever was in the bank account when he was gone. The witness further testified that deceased had told him that he would go down, make new cards and get it straightened out and give someone at the bank a piece of his mind.

Appellant contends that: "The trial court erred in holding that the bank signature card, before alteration by the bank, constituted an unambiguous written contract which could not be varied by parol evidence for the reason that: The bank, the necessary party to the contract, did not accept the same until after alterations made by it."

Section 362.470 V.A.M.S., applicable to banks, authorizes the establishment of savings accounts in the name of two or more persons and to be paid to any one or more of them or the survivor or survivors of them.

■ That the card as it existed prior to the typing thereon, was in the form sufficient to satisfy Sect. 362.470 appears to be of no doubt. *This being true, there being no allegation* or evidence of fraud, undue influence, mental incapacity or fiduciary relationship, the trial court was obligated to enforce the agreement.

Now in doing so the trial court considered that the typing placed on the card was, first of all under the admitted evidence, placed there in direct violation of the terms of the agreement specifically requiring any changes be made in writing and signed by both parties.

This would have been sufficient to have held for the survivor of the account. However, in addition the trial court held that since the typing could only get on the card subsequent to its execution by the parties by the admittance of parol testimony which sought to change or vary the original card, then in the light of the Commerce Trust Company v. Watts and Connor v. Temm cases, among others, the parol testimony which sought to show a different intention from the original card was disregarded and the survivor of the account entitled to the proceeds.

The holding in Commerce Trust Company v. Watts, 360 Mo. 971, 231 S.W.2d 817, is that when a written agreement is signed by both parties to a joint account, stating that they hold as joint tenants and that the proceeds are payable to either of them during their joint lives and to the survivor, the courts will enforce the agreement as it is written and will not admit parol evidence, direct or circumstantial to show that their actual or legal interest was different from that expressed in the writing.

In the Watts case, 231 S.W.2d l.c. 822, the Supreme Court said: "[W]here this contract * * * so unequivocally and unambiguously reflects the entire engagement of the parties, and where the intention of the parties appears so crystal clear from the words they used in the contract, we cannot escape the conclusion that this contract and these facts present no recognized exception to the parol evidence rule. * * * [W]e cannot close our eyes to the formalities observed here nor can we ignore the intent of the contracting parties as they themselves expressed it."

In Connor et al. v. Temm, Mo.App., 270 S.W.2d 541, there was a written "Depositor's Agreement" signed by both parties to the joint account. In that case the St. Louis Court of Appeals said it was the court's duty to follow the decision in Commerce Trust Company v. Watts, *supra.* The court further said, l.c. 546:

"The written contract in this case is not identical in language with that in the Watts case, but it does constitute an unambiguous agreement for joint ownership, with rights of survivorship. It is not at-

tacked for fraud, duress, undue influence, or any other reason that would invalidate it as a contract. Following the Watts case, we must hold that its terms and provisions may not be varied by testimony indicating the intention of the parties to have been to the contrary of what they then declared in writing."

Now in the face of the above authorities, the appellant takes the position that: The cards as returned did comply with the cases, making the account balance belong to the survivor, Waller, *but,* the card was not "accepted" by the bank until it had been changed by the typing placed thereon and, since it was *then* ambiguous, the parol testimony was admissible to show that Mr. Williams "intended" and that he did only "intend" to give authority to sign.

The difficulty with that position is that it finds no support in the evidence. There was absolutely no evidence by way of the card itself or in the testimony of either Mr. Pence or Mrs. Waters or any rule or by-law of the bank that any "acceptance" was required by the bank.

■ What appellant seeks to do here is to show that, subsequent to the card's execution *one* of the co-signers, wanted or "intended" a different legal situation to exist. This in the face of the positive language of the written instrument that it could "not be changed except by written notice" to said bank "signed by both" Mr. Williams and Mrs. Waller. In spite of anything that may be said, the fact remains, the evidence as to how the typing got on there requires *parol testimony subsequent to the card's execution.* To do this violates the holding in the Watts decision. We rule the contention against appellant.

Appellant's next point is that respondent's claim must fail because she "did not meet the required burden of proof to show intention to make a gift." In support of this contention appellant cites the cases of In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, and In re Patterson's Estate, Mo.Sup., 348 S.W.2d 6.

These cases hold that where the relationship of trust or confidence exists the burden is upon the donee to show the absolute fairness and validity of the gift, and that it was entirely free from the taint of undue influence. In view of the facts in the instant case the rule announced in those cases had no application. The case of Shaw v. Butler, Mo.Sup., 78 S.W.2d 420, states what must appear in order for a confidential relationship to arise. We quote syl. 6 of that opinion.

"That grantor trusted grantee and had confidence in him and spoke highly of him and had great·affection for him as a father for his son, held not to show such confidential relationship as to warrant inference of undue influence when grantor executed deed since to constitute 'confidential relationship' there must be evidence of special trust with respect to *property or business.*" (Emphasis ours)

■ The evidence in the instant case does not admit of any possibility the survivor stood in any relationship to deceased other than a sister helping care for her brother. Deceased owned a farm near Liberty and bought and sold livestock. In the early part of 1966 he developed heart trouble which later caused his death. The transcript is replete with evidence of deceased's mental ability and the fact that no fraud or duress was practiced, nor was deceased under the influence of survivor Waller, nor was there a fiduciary relationship existing between Mrs. Waller and Mr. Williams. The contention lacks merit.

Appellant also asserts that the "evidence conclusively establishes lack of delivery which is an essential element of a gift." In contending that the evidence shows only an "incompleted" delivery appellant again argues her theory of no "acceptance" by the bank, which theory we have rejected.

The judgment was for the right party and should be affirmed. Your Special Commissioner so recommends.

PER CURIAM:

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is affirmed.

All concur.

SHANGLER, J., not participating because not a member of the Court when the case was submitted.